IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NOUSHIN IZADIFAR, M.D.,            )
                                   )
            Plaintiff,             )
                                   )
    v.                             )    No.  03 C 2550
                                   )
LOYOLA UNIVERSITY, et al.,         )
                                   )
            Defendants.            )

MEMORANDUM OPINION AND ORDER

Dr. Noushin Izadifar has brought suit against Drs. Stephen

Slogoff and Anthony Barbato and her former employer, Loyola

University of Chicago ("Loyola"),[1] asserting various claims

stemming from her termination by Loyola in July 2002.  Those

claims include discrimination in violation of Title VII of the

Civil Rights Act ("Title VII," 42 U.S.C. §2000e), defamation and

tortious interference with contract.  Loyola has moved for

partial summary judgment pursuant to Fed. R. Civ. P. ("Rule") 56

as to the Title VII claim, and Loyola and Drs. Slogoff and

---

[1] Initially Dr. Izadifar had also sued Loyola University
Physician's Foundation ("Foundation"), Kim Trevino, R.N.
("Trevino") and Dr. Elaine Adams.  On July 3, 2003 this Court
granted Dr. Izadifar's motion to dismiss Dr. Adams voluntarily.
On July 28, 2003 this Court granted the United States' motion to
be substituted for Trevino pursuant to the Federal Tort Claims
Act ("Act," 28 U.S.C. §2679(d)(1)), thus eliminating Trevino as a
party defendant.  And because Dr. Izadifar had failed to exhaust
her administrative remedies as required by the Act, this Court
simultaneously dismissed the United States as a party defendant.
On March 29, 2005 judgment was entered in favor of Dr. Izadifar
and against the Foundation pursuant to a Rule 68 offer of
judgment, leaving only Loyola and Drs. Slogoff and Barbato as
party defendants.

Barbato have moved for summary judgment as to the defamation and tortious interference with contract claims.

After receiving the movants' briefs and Dr. Izadifar's response, this Court orally denied Loyola's motion as to the Title VII claim on April 28, 2005, but it ordered a reply as to the other claims. That submission is now in hand, and all parties have also tendered statements of material fact as called for by this District Court's LR 56.1.[2]

Even when the record is viewed in Dr. Izadifar's favor as required by Rule 56, she has not come forward with enough facts-- either established or disputed--of a material (that is, outcome- determinative) nature for a reasonable jury to conclude that she ought to prevail on either her defamation or tortious- interference-with-contract claims. Hence all three defendants' motions as to those claims are granted.

## Rule 56 Standards

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue of material fact (Celotex Corp. v.

---

[2] LR 56.1 requires parties to submit evidentiary statements and responses to those statements to highlight which facts are disputed and which facts are not. This opinion cites to Dr. Izadifar's LR 56.1 statement as "I. St. ¶ --," to the joint statement of all three defendants as "L. St. ¶ --" and to their respective responses as "I. Resp. ¶ --" and "L. Resp. ¶ --." Where either party's LR 56.1 statement is undisputed by the opponent, this opinion includes only a citation to the original statement. Memoranda and documents submitted by the parties are also identified by those same "I." and "L." designations.

2

Catrett, 477 U.S. 317, 322-23 (1986)). For that purpose courts consider the evidentiary record in the light most favorable to nonmovants and draw all reasonable inferences in their favor (Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir. 2002)). But to avoid summary judgment a nonmovant "must produce more than a scintilla of evidence to support his position" that a genuine issue of material fact exists (Pugh v. City of Attica, 259 F.3d 619, 625 (7th Cir. 2001)) and "must set forth specific facts that demonstrate a genuine issue of triable fact" (id.).

Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). What follows is a summary of the relevant facts, viewed of course in the light most favorable to nonmovant Dr. Izadifar--but within the limitations created by the extent of her compliance (or noncompliance) with the strictures of LR 56.1.

## Facts

Dr. Izadifar was hired as a member of Loyola's faculty in the Department of Radiation Oncology at the Stritch School of Medicine on April 1, 2000, entering into a one-year employment contract that was renewed on June 7, 2002 (L. St. ¶¶8, 9; L. Ex. E). By virtue of her Loyola faculty position, Dr. Izadifar also entered into a "Provider Employment Agreement" with the Foundation under which Dr. Izadifar agreed to provide clinical

3

patient care services at the Loyola University Medical Center
("Medical Center")(L. St. ¶13; L. Ex. F). On May 28, 2002 that
agreement was also renewed (id.).

Dr. Izadifar provided gynecologic radiation oncology
treatment at Hines V.A. Hospital ("Hines") once a week, using
High Dosage Rate ("HDR") machinery located at Hines (L. St. ¶17).
Loyola apparently had an agreement with Hines calling for Loyola
physicians to staff Hines' Radiation Oncology Department, while
Hines provided equipment, nursing personnel and support staff (L.
St. ¶15; L. Ex. B at 85-86).³ It was a dispute between Dr.
Izadifar and Hines nurse Trevino that set off the chain of events
leading to Dr. Izadifar's termination from the Loyola faculty on
July 17, 2002.⁴

On April 17 Hines began using a new HDR machine (L. Ex. B at
90). Dr. Izadifar performed three procedures that day, with
Trevino assisting (D. Ex. B at 95). Those procedures were
apparently completed without incident. But on April 22 Dr.
Izadifar received a call from Dr. Najeeb Mohideen, a physician in

---

³ "Apparently" is used here because the parties have
included very little evidence as to the nature of Hines'
relationship with Loyola or the Medical Center or Foundation. In
addition, the parties' submissions also shed little light on the
precise nature of the relationships among the three Loyola
entities. No matter, for as will be seen later, the exact nature
of those relationships is not material to a resolution of Dr.
Izadifar's state law tort claims.

⁴ Because all relevant dates were during the year 2002,
from here on out the year designation will be omitted.

4

Loyola's Department of Radiation Oncology, who told her that Trevino had submitted a complaint regarding the safety of Dr. Izadifar's procedures (id. at 97). Trevino had expressed that the HDR equipment was not being properly decontaminated between procedures (id. at 97-98). Dr. Izadifar disagreed with Trevino's complaint and believed her actions to be inappropriate (id. at 99-102). Dr. Izadifar had previously clashed with Trevino, considering her to be "insubordinate and problematic" (id. at 103).

On April 24 Dr. Izadifar went to Hines to perform her regularly scheduled HDR procedures (L. Ex. B at 119). Once again a dispute arose between Trevino and Dr. Izadifar, this time after Dr. Izadifar was told that Trevino had assisted a patient's sister in filing a complaint against Dr. Izadifar (id. at 126). Dr. Izadifar asked that Trevino be removed from her remaining procedures (id. at 127-28). After hearing of that request, and in Dr. Izadifar's presence, Trevino began to tear apart documents that belonged in a patient's chart (id. at 130). In response Dr. Izadifar unsuccessfully attempted to take the documents from Trevino's hands (L. St. ¶20), prompting Trevino to scream "Don't touch me" repeatedly (L. Ex. B at 134). Trevino then took the documents and gave them to another Hines employee, who returned them to Dr. Izadifar (id. at 135). Dr. Izadifar completed another procedure, assisted by a different nurse, and left Hines

5

without further incident (id.)

On April 26 Dr. Izadifar wrote a memorandum to Dr. Bahman Emami, chairman of Loyola's Department of Radiation Oncology, who had not been at Hines on April 24 (L. St. ¶26; L. Ex. L). Dr. Izadifar described the April 17 and 24 incidents, admitting that she attempted to take documents out of Trevino's hands, but denying that she touched any part of Trevino's body (id.). In an April 29 memorandum to Dr. Elaine Adams, Chief of Medical Services at Hines, Dr. Emami called for disciplinary action against Trevino, stating that "her malicious intention continues to undermine the activities of physicians at Loyola" (L. St. ¶50; L. Ex. O).

After the April 24 incident Dr. Adams met with Dr. Barbara Temeck, Hines' Chief of Staff (I. Resp. ¶23). They agreed that Dr. Adams would investigate the situation, and on April 26 Dr. Adams requested a meeting with Dr. Izadifar (L. St. ¶27; I. St. ¶135). When the two of them met on April 29, Dr. Izadifar again admitted that she had attempted to take documents from Trevino's hands but denied touching Trevino (L. St. ¶29; I. St. ¶135).

Dr. Adams met with Trevino soon after that in May (L. St. ¶33). Dr. Adams observed that Trevino "felt very threatened by Dr. Izadifar. [Trevino] felt that she was not allowed to talk to [Dr. Izadifar], not allowed to speak her mind...that her questions and efforts...on behalf of patients were rebuffed by

6

Dr. Izadifar" (I. Resp. ¶33). Dr. Adams was also "struck that despite it [sic] was several weeks after the event...[Trevino] was extremely upset, tearful, shaking, appeared very frightened of the episode" (L. St. ¶34).

Dr. Adams also sought information from other physicians at Hines. On May 2 she received a written report from Dr. Mohideen that (1) detailed his involvement in the ongoing dispute as to the proper sterilization procedures to be employed in HDR treatments at Hines (L. St. ¶35; L. Ex. M) and also (2) discussed his knowledge of the April 24 incident between Dr. Izadifar and Trevino (L. St. ¶35; L. Ex. M at LUC 0567):

> At the end of the day around 4:45 p.m. Kim [Trevino] paged me to tell me that during the further interaction between Dr. Izadifar and her....Dr. Izadifar had moved towards her to [sic] causing her to cry out "don't touch me" which a number of people had heard and come [sic] running. She wanted to know if she should file a complaint. I said that it was basically up to her and I am in no position to describe that event as I was not a witness to it or the subsequent shouting that occurred.

Dr. Adams also met personally with Dr. Mohideen to discuss the incident (L. St. ¶36). And to determine whether other doctors had problems working with Trevino, Dr. Adams also met with Drs. Edward Melian and Sarada Reddy, physicians in Loyola's Department of Radiation Oncology (L. St. ¶37).

After completing her investigation, Dr. Adams prepared a written report, which she sent to Dr. Temeck on June 6 (I. St. ¶136). That report explained that it contained information

7

gleaned from "multiple individual and group meetings" and that it focused "on the conflictual relationship between...Izadifar and...Trevino" (L. Ex. J). In particular the report outlined three episodes (id.):

1. Dr. Izadifar's refusal in February to work with a particular nurse, followed by Trevino's refusal (in her role as Nurse Coordinator) to remove the nurse from Dr. Izadifar's procedures;

2. the use of unsterilized equipment during the April 17 HDR treatments; and

3. the April 24 incident.

As to the April 24 incident Dr. Adams' report reads (L. Ex. J):

On 4/24/02, the sister of a patient being treated by Dr. Izadifar complained about the medical care the patient was receiving. Ms. Trevino offered to type up the complaints. An angry interchange occurred when Dr. Izadifar discovered this. Finally Dr. Izadifar attempted to take something from Ms. Trevino's hands, striking her hand. Ms. Trevino reported feeling threatened and shouted to co-workers. Ms. Trevino attempted to leave the room, but her exit was blocked by Dr. Izadifar. Dr. Mohideen, acting administratively in Dr. Emami's absence had to intervene.

In the section entitled "Conclusion and Recommendations," the report reads (id.):

Dr. Izadifar's physical attack on Ms. Trevino is unacceptable. Disciplinary action is recommended.

Dr. Adams also forwarded a copy of her report to Dr. Emami (id.).

Dr. Emami met with Dr. Slogoff, Dean of Loyola's Stritch School of Medicine, in early June and told him about the April 24

8

incident (L. St. ¶56). As Dean, Dr. Slogoff participated in decisions involving faculty salaries, promotions and terminations, but he did not personally have the authority to terminate a faculty member (L. St. ¶59). Dr. Slogoff requested that Dr. Emami confirm the occurrence of the incident (L. St. ¶56; L. Ex. I at 18).

On June 11 Dr. Emami forwarded Dr. Adams' report to Dr. Slogoff (I. St. ¶138). While the accompanying memorandum states "[e]nclosed you will find [Dr. Adams'] report, as well as the report of Dr. Mohideen, who has witnessed Dr. Izadifar's latest incident at Hines VA Hospital" (D. Ex. P), Dr. Slogoff testified that Dr. Mohideen's report was not in fact attached (L. Ex. I at 45). Dr. Emami's memorandum also requested a meeting among Dr. Emami, Dr. Slogoff, Director of Faculty and Administrative Services Donna Halinski ("Halinski") and Dr. Izadifar to "finalize the discussion and the decision" (L. Ex. P).

After reading Dr. Adams' report, Dr. Slogoff called Dr. Adams to confirm its allegations (L. St. ¶64). Dr. Slogoff had known Dr. Adams for some time and had great respect for her professional ability and personal integrity (L. St. ¶65). Dr. Adams assured Dr. Slogoff that her report was accurate (id.). Dr. Slogoff did not speak with any of the parties involved in the April 24 incident, nor did he undertake any other independent investigation of the allegations in Dr. Adams' report (L. St.

9

¶60).

Following his conversation with Dr. Adams, Dr. Slogoff met with Dr. Barbato, who as Loyola's Vice President for Health Sciences was his immediate superior (L. St. ¶¶66, 78). During that meeting they agreed that action would have to be taken as to Dr. Izadifar if the allegations in Dr. Adams' report were true, but that they would wait for Dr. Emami's recommendation (L. St. ¶68).

In an apparent change of position from his April 29 memorandum (in which, it will be remembered, he had recommended to Dr. Adams that disciplinary action be taken against Trevino, with no adverse recommendation as to Dr. Izadifar), Dr. Emami recommended to Dr. Slogoff on July 10 that Dr. Izadifar's faculty appointment be terminated (L. Ex. R):

Attached is a memo from Dr. Elaine Adams regarding Dr. Izadifar's recent behavior in the clinic. Of particular concern to me is an incident involving one of the nurses resulting in a physical assault. I have thoroughly investigated this incident and met with Dr. Adams personally.

Dr. Adams recommends that disciplinary action is in order. Due to the institution's aversion to hostility and/or violence in the workplace, I believe it is appropriate to terminate Dr. Izadifar's appointment for cause.

Dr. Slogoff reviewed Dr. Emami's recommendation and considered it appropriate in light of Dr. Adams' assessment that Dr. Izadifar had threatened Trevino physically (L. St. ¶¶72, 73).

On July 11 Dr. Slogoff wrote this letter to Dr. Barbato (L.

10

Ex. S):

> I am enclosing a letter from Dr. Elaine Adams to Dr. Barbara
> Temeck and a letter from Dr. Bahman Emami addressed to me
> dealing with a specific incident that occurred at the Hines
> V.A. Hospital.  This behavior is absolutely unacceptable for
> one of our faculty members and I fully support Dr. Emami's
> recommendation to immediately terminate Dr. Izadifar's
> faculty appointment for cause.

Dr. Emami and Halinski also received copies of that letter (L.

St. ¶76).  Dr. Barbato reviewed Dr. Adams' report and spoke

personally with her about the incident (L. St. ¶85; I. Resp.

¶85).  Dr. Adams, whom Dr. Barbato considered to be a "careful,

thoughtful, sensitive, thorough, detail oriented person with a 20

plus year history of credibility," expressed confidence in the

accuracy of her report (L. St. ¶¶86, 87; L. Ex. Q at 19).  Other

than speaking with Dr. Adams, Dr. Barbato did nothing else to

verify the contents of her report, nor did he personally speak

with anyone directly involved in the April 24 incident (L. Ex. Q

at 21).

Dr. Barbato then referred the matter to Loyola's Committee

on Faculty Appointments, which also issued a recommendation that

Dr. Izadifar be terminated (L. St. ¶¶80, 81).  On July 17, 2002

Dr. Barbato accordingly sent Dr. Izadifar a termination letter

that read in part (L. Ex. T):

> The University's Committee on Faculty Appointments recently
> reviewed a recommendation to terminate your faculty
> appointment for cause based on grave misconduct.  This
> recommendation was brought forward due to a recent incident
> in which you physically assaulted a nurse at the Hines VA
> Hospital.  The Committee on Faculty Appointments recommended

11

to me your immediate termination.

> As Vice President for the Health Sciences, it is my
> responsibility to inform you that I have accepted the
> Committee's recommendation and your faculty appointment has
> been terminated effective immediately. The termination of
> your faculty appointment immediately terminates your
> clinical privileges as well.

Dr. Slogoff, Medical Center Chief of Staff Dr. Leonard Vertuno
and Foundation President Michael Vivoda ("Vivoda") also received
copies of that letter.

Vivoda in turn sent Dr. Izadifar a letter on July 19 that
terminated her Provider Employment Agreement with Foundation (L.
St. ¶92; L. Ex. V) and read in pertinent part (id.):

> A faculty appointment in the [Stritch School of Medicine]
> and clinical privileges at LUMC are requirements of you
> current employment contract with LUPF.
> The loss of your faculty appointment and clinical privileges
> requires LUPF to hereby terminate your Provider Employment
> Agreement, effective immediately.

Shortly after Dr. Izadifar then took unsuccessful appeals of her
terminations to Dr. Barbato and to Loyola's Faculty Appeals
Committee (L. St. ¶¶101, 103), she filed this lawsuit.

## Defamation

Dr. Izadifar's Complaint Count II asserts defamation claims
against Loyola and Drs. Slogoff and Barbato. Those claims rest
on two communications: Dr. Slogoff's July 11 letter recommending
Dr. Izadifar's termination and Dr. Barbato's July 17 letter
terminating her Loyola Faculty Contract. Dr. Izadifar argues
that the discussion of her April 24 conduct in those letters

constitutes defamation per se or per quod or both. To prove that either of those communications constitutes defamation, Dr. Izadifar must show (1) a false statement in (2) an unprivileged publication (3) that has caused damage (although defamation per se imputes damages without requiring plaintiff to offer evidence on that score)(Parker v. House O'Lite Corp., 324 Ill.App.3d 1014, 1020, 756 N.E.2d 286, 291-92 (1st Dist. 2001)).

Because a dispute exists as to the truth of the statements in both communications about the April 24 incident, the record must be viewed in Dr. Izadifar's favor. So it is assumed here that those statements were false--that is, that she did not physically assault Trevino. As for the element of publication, no one quarrels with the sufficiency of delivery of the letters themselves. But the publication of admittedly false statements is not actionable where a privilege applies (Kuwik v. Starmark Star Mktg. & Admin., Inc., 156 Ill.2d 16, 24, 619 N.E.2d 129, 133 (1993)). And Dr. Izadifar concedes that a qualified privilege applies to the statements at issue here, for such a privilege is accorded to statements made by an employer in attempting to investigate and correct misconduct on behalf of its employees (Popko v. Cont'l Cas. Co., 355 Ill. App.3d 257, 823 N.E.2d 184, 190 (1st Dist. 2005)).

That however does not end the matter, for even where a qualified privilege exists "the communication can still be

13

defamatory and actionable if the privilege is abused" (<u>Gibson v. Philip Morris, Inc.</u>, 292 Ill.App.3d 267, 275, 685 N.E.2d 638, 645 (5th Dist. 1997)). To prove such abuse a plaintiff must show a direct intention to injure her or a reckless disregard of her rights and of the consequences that could result from the publication of false information (<u>id.</u>). Importantly, reckless disregard of a plaintiff's rights can include the failure to engage in a proper pre-publication investigation of the truth of a statement (<u>id.</u>).

On that score Dr. Izadifar urges that the investigation by Drs. Slogoff and Barbato of the truth of the allegation that she physically assaulted nurse Trevino was so deficient as to constitute reckless disregard of her rights. To that end she advances two arguments.

First Dr. Izadifar contends that their investigation was deficient insofar as they relied on a report that was "plainly flawed and biased" (I. Mem. 3). She argues that Dr. Adams was not an independent investigator and implies that Dr. Emami, who she alleges sexually assaulted and harassed her repeatedly during her employment at Loyola, heavily influenced Dr. Adams' report. But even assuming the truth of those claims, Dr. Izadifar brings forth no facts demonstrating knowledge of, or any reasonable basis for suspecting, any such bias on the part of Dr. Slogoff or Dr. Barbato. Indeed, the record reveals the opposite: Both

14

Drs. Slogoff and Barbato considered Dr. Adams to be highly credible, and neither had any reason to doubt the validity of her report.

Where a qualified privilege is established, "the plaintiff must come forward with actual evidence creating an issue of fact" as to an abuse of that privilege (Vickers v. Abbott Labs., 308 Ill.App.3d 393, 404, 719 N.E.2d 1101, 1110 (1st Dist. 1999)). Consequently Dr. Izadifar's own assertions of bias on the part of Drs. Emami and Adams, when coupled with her unsubstantiated statements that such bias was obvious to Drs. Slogoff and Barbato, simply do not suffice.

Second, Dr. Izadifar asserts that the failure by Drs. Slogoff and Barbato to demand an investigation in conformity with Medical Center's Medical-Dental Staff Bylaws ("Medical Center Bylaws") is prima facie evidence of the recklessness of their conduct because the Medical Center Bylaws provided "essential safeguards" that their "ad hoc" investigation did not (I. Mem. 13-14). In that respect, the parties dispute vigorously whether in terminating Dr. Izadifar's Loyola faculty appointment Drs. Slogoff and Barbato were required to follow the Medical Center Bylaws, which govern Medical Center clinical staff. But that disagreement is of no moment to Dr. Izadifar's defamation claim. For that purpose the important issue is not whether a defendant's investigation conformed to a particular policy, but rather

"whether defendant's investigation was so deficient that it was conducted in reckless disregard of plaintiff's rights" (<u>Vickers</u>, 308 Ill.App.3d at 406, 719 N.E.2d at 1112).

Neither Dr. Slogoff's nor Dr. Barbato's investigation was so deficient. Both reviewed Dr. Adams' report and personally discussed its conclusions with Dr. Adams. While a more thorough investigation was certainly possible, it cannot be said that the reliance by Drs. Slogoff and Barbato on a report from a respected physician whose motives they had no reason to question was improper. There being no other evidence calling into question the reasonableness of their conduct, Dr. Izadifar has failed to show that their republication of the information contained in Dr. Adams' report was an act done in reckless disregard of her rights.

In sum, no genuine issue of material fact exists as to Dr. Slogoff's or Dr. Barbato's knowledge of the falsity of their statements, or as to the reasonableness of their investigation into the truth of those statements. That being so, their communications are privileged and Drs. Slogoff and Barbato and Loyola are entitled to judgment as a matter of law as to Dr. Izadifar's defamation claims.

## Tortious Interference with Contract

Dr. Izadifar's Complaint Count III asserts a claim of tortious interference with contract. That claim is essentially

16

premised on the same communications underlying the defamation claim: Dr. Slogoff's July 11 letter and Dr. Barbato's July 17 letter. Dr. Izadifar claims that those communications constituted tortious interference with her Loyola employment contract and with her Provider Employment Agreement with Foundation.

Under Illinois law, any such tort claim requires a plaintiff to establish: "(1) the existence of a valid and enforceable contract between the plaintiff and a third party; (2) defendant's awareness of the contract; (3) defendant's intentional and unjustified inducement of a breach; (4) defendant's wrongful conduct caused a subsequent breach of the contract by a third party; and (5) damages" (Purmal v. Robert N. Wadington & Assocs., 354 Ill.App.3d 715, 727, 820 N.E.2d 86, 98 (1st Dist. 2004)). Dr. Izadifar fails those requirements as to both her Loyola Faculty Contract and her Provider Employment Agreement with Foundation.

Dr. Izadifar first asserts that Drs. Slogoff and Barbato made false statements to induce Loyola to breach her employment contract.[5] But Illinois law affords a conditional privilege to

---

[5]    While it is not entirely clear whether Dr. Izadifar also seeks to make that claim against Loyola as well, any such attempt would be foreclosed by the obvious proposition that a party cannot interfere with its own contract (see, e.g., Cromeens, Holloman, Sibert, Inc. v. AB Volvo, 349 F.3d 376, 397 (7th Cir. 2003)).

17

those who would interfere with a contract when they "act to
protect a conflicting interest which is considered to be of equal
or greater value than that accorded the contractual rights
involved" (Langer v. Becker, 175 Ill.App.3d 745, 750, 531 N.E.2d
830, 833 (1st Dist. 1988)). In that respect "an employee acting
in the interest of his employer is privileged to interfere with a
contract between his employer and a co-employee" (id.) That
privilege may be overcome only upon a plaintiff's showing of
actual malice (id., 175 Ill.App.3d at 751, 531 N.E.2d at 833-34),
for which purpose "more than ill will must be shown. The
evidence must establish that defendant had acted with a desire to
harm which was unrelated to the interest he was presumably
seeking to protect by bringing about the breach" (Phillip I.
Mappa Interests, Ltd. v. Kendle, 196 Ill.App.3d 703, 708, 554
N.E.2d 1008, 1012 (1st Dist. 1990)).

Even then if it were to be assumed that Dr. Slogoff's and
Dr. Barbato's statements were false and that Dr. Izadifar can
satisfy the remaining elements of the tortious interference with
contract claim, Dr. Slogoff's and Dr. Barbato's actions were
clearly privileged. While Dr. Izadifar's Complaint has alleged
that the statements by Drs. Slogoff and Barbato "were not made in
furtherance of any interest of [Loyola]," mere allegations do not
rise to the required level of proof (or even of inference)--and
she offers no alternative explanation for their actions, nor does

18

the record disclose any. Clearly Drs. Slogoff and Barbato acted in the interest of Loyola in recommending and effectuating the termination of a faculty member who they believed had engaged in grave misconduct. And Dr. Izadifar admits that she has no evidence of any improper motive on Dr. Slogoff's or Dr. Barbato's part (I. Resp. ¶¶77, 93). Hence Dr. Izadifar cannot overcome the privilege afforded their conduct, and her claim that they tortiously interfered with her Loyola employment contract therefore fails as a matter of law.

Dr. Izadifar also advances the same category of claim of tortious interference with her Provider Employment Agreement with Foundation. Here it will be remembered that Foundation terminated its contract with Dr. Izadifar two days after receiving a copy of Dr. Barbato's July 17 termination letter. There is a question whether Foundation's termination of the Provider Employment Agreement in accordance with its Paragraph 6.1(g)(L. Ex. F)[6] constitutes a "breach" (the fourth element of the asserted claim). But that apart, Dr. Izadifar cannot establish the third element--that Dr. Slogoff, Dr. Barbato or Loyola intentionally and unjustifiably induced any such

---

[6] Paragraph 6.1(g) provided that Foundation could terminate the agreement immediately "[u]pon loss of faculty status at [Loyola's Stritch School of Medicine]" (L. Ex. F). Relatedly, Dr. Izadifar warranted in Paragraph 5(c) that "Provider shall at all times during the term of this Agreement maintain an appointment as a faculty member of the Stritch School of Medicine."

breach--in any event.

Inducement, in the context of a claim for tortious interference with contract, "requires some active persuasion, encouragement, or inciting that goes beyond merely providing information in a passive way" (In re Estate of Albergo, 275 Ill.App.3d 439, 446, 656 N.E.2d 97, 103 (2d Dist. 1995)). And as the Restatement (Second) of Torts §772(a) teaches, one does not interfere improperly with another's contractual relations merely by giving a third party truthful information--a principle echoed in Illinois law (George A. Fuller Co. v. Chicago Coll. of Osteopathic Med., 719 F.2d 1326, 1332 (7th Cir. 1983)).

Dr. Izadifar complains that "false statements" by Dr. Slogoff, Dr. Barbato and Loyola induced Foundation to breach its contract with her. But as Vivoda's July 19 letter makes plain, Foundation terminated the Provider Employment Agreement not because it believed Dr. Izadifar had physically assaulted Trevino, but instead because the terms of that agreement required Dr. Izadifar to maintain her faculty appointment at Loyola.

Thus Dr. Barbato did not actively induce Foundation to terminate an agreement that would have remained intact absent his July 17 letter. Instead he simply notified Foundation of the status of Loyola's contractual relationship with Dr. Izadifar, thus providing information to which Foundation was entitled in any event. That does not constitute improper inducement. And

20

because Dr. Izadifar has adduced no other evidence to establish interference with Foundation's Provider Employment Agreement on the part of Dr. Slogoff, Dr. Barbato or Loyola, her tortious interference with contract claim fails in that respect as well.

## Conclusion

Dr. Izadifar has not carried any of her burdens of showing a genuine issue of material fact. Dr. Slogoff, Dr. Barbato and Loyola are thus entitled to a judgment as a matter of law as to both her defamation and her tortious interference with contract claims.

Each movant's motion for summary judgment as to those claims is therefore granted. This Court defers any potential ruling as to whether a Rule 54(b) determination should be made as to those claims, at least as to Drs. Slogoff and Barbato. This case is set for a status hearing at 9 a.m. June 17, 2005, at which time the parties will be expected to address both that question and the procedure and timing for going forward on Izadifar's surviving Title VII claim.

Milton I. Shadur
Senior United States District Judge

Date: June 7, 2005

21